**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **SANDRA TREVINO HESTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 06-1172** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GUARDSMARK, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D), defendant, Guardsmark, Inc. (hereafter "defendant" or "Guardsmark"), states that there are no genuine issues of material fact in this matter and submits its Motion for Summary Judgment

**INTRODUCTION**

Plaintiff brings this action alleging retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964 and seeks compensatory damages and other statutory relief.

Plaintiff began working for Guardsmark in January 1999 as a firefighter stationed at an Inland Steel facility in East Chicago, Indiana, a location where Guardsmark had contracted to provide security/fire protection services. She was subsequently transferred to a security officer position at a Caterpillar facility in Joliet, Illinois where Guardsmark also provided security services; and in 2001, she was transferred to another facility in Joliet known as Cat Logistics as a security officer. Following the transfer to Cat Logistics, plaintiff filed an EEOC Charge against Guardsmark on May 17, 2002 alleging sex discrimination and retaliation. After completing its

1

investigation of this Charge, the EEOC closed the matter and no further action was ever taken on it by either the Commission or the plaintiff.

On October 17, 2002, following numerous performance deficiencies evidenced by written and oral disciplinary actions and client complaints, plaintiff was terminated by Guardsmark supervisors Michael W. Jankovsky, Manager in Charge, and Jeremy M. Baumann, Unit Manager, at the Cat Logistics facility; plaintiff was given a written termination notice signed by both these supervisors. On December 2, 2002, she filed with the EEOC the applicable Charge of Discrimination underlying this lawsuit, alleging that she had been retaliated against for having filed the previous Charge on May 17, 2002.

On November 25, 2003, while the Charge applicable to this lawsuit was still under investigation by the EEOC, plaintiff and her husband filed a Chapter 7 Voluntary Petition in the United States Bankruptcy Court, Northern District of Indiana, Case No. 03-65712-jpk. Plaintiff did not list her pending Charge in any of the Schedules of Property filed in the bankruptcy proceeding, and the bankruptcy case was subsequently closed on March 25, 2004.

The EEOC issued its Notice of Right to Sue on the claim at issue here on August 10, 2005, and this lawsuit was commenced on November 3, 2005.

## UNDISPUTED MATERIAL FACTS

1.    Guardsmark provides security services to its clients worldwide and has locations throughout the U.S. (**Jankovsky Aff., Exhibit 1**).

2.    Plaintiff was employed by Guardsmark in January 1999 and was originally stationed at an Inland Steel facility in East Chicago, Indiana in a firefighter position (**Plaintiff's Deposition, Exhibit 2, p. 11-12**).

3.    Plaintiff was transferred in late 1999 or 2000 to a Caterpillar facility in Joliet, Illinois where Guardsmark also provided security services (**Exhibit 2, p. 12**).

4.    Plaintiff was injured while working part time for a volunteer fire department, and after returning to work for Guardsmark at the Caterpillar facility and immediately suffering another injury, she was transferred in 2001 to a security officer position at Cat Logistics, another Guardsmark client account location in Joliet (**Exhibit 2, p. 14-15, 16-18**).

5.    This transfer occurred, in large part, because Guardsmark had been specifically advised by the chief of Caterpillar's internal security department at that facility that Caterpillar had made a decision it did not want plaintiff to work at that facility due to her continuing performance and attendance problems (**Exhibit 1**).

6.    With her transfer to the Cat Logistics location, plaintiff was paid the same amount of wages and continued to perform many of the same tasks she had previously performed during her prior course of employment with Guardsmark (**Exhibit 2, p. 18-20**).

7.    Manager in Charge Michael Jankovsky told plaintiff after her transfer to Cat Logistics that she would not get a pay raise at that time because (a) she was already making as much per hour as the site supervisor, (b) she was making more than any other security officer who held a similar position to hers, and (c) Guardsmark was losing money at the account and could not afford to lose any more (**Exhibit 2, p. 31-32, 59**).

8.   Plaintiff was, in fact, being paid more than any other security officer at the location and was being paid the same amount as the then current site supervisor, Scott Furlong (**Exhibit 2, p. 31-33, 49-50; Exhibit 1**).

9.   On May 17, 2002, plaintiff filed a Charge of Discrimination with the EEOC, Charge No. 24 BA 200061 (**Exhibit 2, p. 37-38 with deposition Exhibit 2**).

10.  Sometime in September 2002, the EEOC closed the matter initiated by the May 17, 2002 Charge of Discrimination (**Exhibit 2, p. 40**).

11.  During her employment at Guardsmark, plaintiff received numerous write-ups and other disciplines, including those dated March 2, 2002 and September 17, 2002, both of which occurred after she had transferred to Cat Logistics (**Exhibit 1; Exhibit 2, p. 62-63**).

12.  The March 2, 2002 write-up informed plaintiff that her attendance at Cat Logistics was unacceptable and her participation in training intended to help client relations was important; that she should not disclose internal Guardsmark information to employees of Cat Logistics; that she had violated Guardsmark's chain of command rule; and that she had refused to follow orders.  She was specifically warned that any further similar action by her would result in her dismissal (**Exhibit 2, p. 63 with Deposition Exhibit 3**).

13.  The September 17, 2002 discipline informed plaintiff that her attendance was unsatisfactory and her tardiness was costing Guardsmark additional money (**Exhibit 1**).

14.     On October 9, 2002, plaintiff's site supervisor, Scott Furlong, tendered his resignation to Guardsmark, citing plaintiff's poor attendance and the hardship it caused him as one of the two main reasons for his resignation (**Exhibit 1**).

15.     On October 13, 2002, Unit Manager Jeremy Baumann met with Kathy Whitten, Cat Logistics' internal supervisor in charge of security at that facility.   Ms. Whitten was critical of plaintiff and informed Baumann of her concerns regarding plaintiff's attendance problems and her demeanor while on duty (**Exhibit 3**).

16.     On October 17, 2002, plaintiff was terminated by Unit Manager Jeremy M. Baumann and by Manager in Charge Michael W. Jankovsky.  She was given the termination letter attached to Exhibits 1 and 3 (**Exhibit 1; Exhibit 3**).

17.     The termination meeting was also attended by Kathy Whitten of Cat Logistics (**Exhibit 2, p. 82**).

18.     On December 2, 2002, plaintiff filed the applicable Charge of Discrimination underlying this lawsuit with the EEOC (**Complaint, paragraph 7 and Exhibit A thereto**).

19.     Nearly a year after filing this EEOC Charge, plaintiff commenced a Chapter 7 Voluntary Petition in the U.S. Bankruptcy Court, Northern District of Indiana, Case No. 03-65712-jpk on November 25, 2003 (**Affidavit of William P. Dougherty, Exhibit 4**).

20.     Plaintiff did not list this claim in the bankruptcy action on any of the Schedules of Property filed in the bankruptcy matter (**Exhibit 4**).

21.     The bankruptcy case was closed by the Court on March 25, 2004 (**Exhibit 4**).

22.    Plaintiff received her Notice of Right to Sue on or about August 10, 2005
(**Complaint, paragraph 3**).

23.    Plaintiff filed her lawsuit on November 3, 2005 (**Complaint and Summons**).

## ARGUMENT

**1.**    **Judicial Estoppel Precludes This Claim**

Plaintiff is judicially estopped from bringing this claim against Guardsmark.  *See:*
*Cannon-Stokes v. Potter*, 453 F.3d 446 (7th Cir. 2004), in which the court held that judicial
estoppel forecloses a plaintiff's claim where an employee did not disclose a pending EEO charge
in the bankruptcy petition and obtained a discharge in bankruptcy.  "All six appellate courts that
have considered this question hold that a debtor in bankruptcy who denies owning an asset,
including a ... legal claim, cannot realize on that concealed asset after the bankruptcy ends." *Id*
at 448.

**2.**    **Plaintiff Cannot Establish Retaliation As A Matter Of Law**

**A.**    **Summary Judgment Standard**

Summary judgment is appropriate if the pleadings, depositions, answers to
interrogatories, and admissions on file show that there is no genuine issue as to a material fact,
and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

A genuine issue of material fact is one which allows the trier of fact to find in favor of the
non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   The court will
view all inferences to be drawn from the facts in the light most favorable to the non-moving
party. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690 (7th Cir. 2006) (*citing Healy v. City of
Chicago*, 450 F.3d 732, 738 (7th Cir.2006)).

The non-moving party cannot respond by merely resting on the pleadings, but rather the non-moving party must present some "specific facts showing that there is a genuine issue for trial." *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003) (*citing* Fed. R. Civ. P. 56(e)).   The existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to overcome a motion for summary judgment.  *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (*quoting Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000)).  Rather, the non-moving party must go beyond the face of the complaint and "'present evidence from which a jury might return a verdict in [her] favor.'" *East-Miller v. Lake County Highway Dept.*, 421 F.3d 558, 564 (7th Cir. 2005) (*quoting Anderson*, 477 U.S. at 256).

If the non-moving party cannot sufficiently prove an essential element of a claim with respect to which it has the burden, then the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-34 (1986).

"Under Rule 50, a court should render judgment as a matter of law 'when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149 (2000) (*quoting* Fed. R. Civ. P. 50(a)) (remaining citations omitted); *see also Reeves*, 530 U.S. at 150 (the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same").

**B.    Applicable Legal Standards**

Title VII prohibits an employer from retaliating against an employee because she has opposed any practice made an unlawful employment practice by Title VII or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing under Title VII. 42 U.S.C. § 2000e-3(a); *see Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

**C.    Evidentiary Standards**

A plaintiff may establish a claim of unlawful retaliation under Title VII either by introducing direct evidence of such retaliation, or by proving circumstantial evidence which would support an inference of retaliation. *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1028 (7th Cir. 2004). The Supreme Court has also articulated that in a so called "mixed motive" case, "direct evidence of discrimination is not required." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148 (U.S. 2003). Accordingly, a plaintiff may prove a mixed motive case by indirect evidence. "[T]he ultimate question at summary judgment on a mixed-motive case is 'whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that [a protected characteristic] was a *motivating factor* in [the defendant's adverse employment action against the plaintiff]." See in this regard, *Boyd v. Illinois State Police*, 384 F.3d 888, 895 (7th Cir. 2004).

The direct evidence and circumstantial evidence paths are alternative approaches; a plaintiff need only prove one or the other, not both. *Hottenroth*, 388 F.3d at 1028.

1.    Direct Evidence

Under the direct evidence approach, the plaintiff may establish a prima facie case of retaliation by presenting "'direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that [s]he engaged in protected activity (filing a charge of discrimination) and *as a result* suffered the adverse employment action of which [s]he complains.'" *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902 (7th Cir.

2006) (*quoting Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640, 644 (7th Cir.2002)) (emphasis in original).

Direct evidence may include evidence of actions or remarks by the employer that reflect a discriminatory attitude.  However, stray remarks in the workplace, when unrelated to the decision-making process, are insufficient to establish a prima facie case of discrimination, even when the statements are made by the decision-maker at issue. *See Scaife v. Cook Co.*, 446 F.3d 735, 741-42 (7th Cir. 2006).    There must be a link or nexus between the discriminatory statement or conduct and the allegedly prohibited act of discrimination to establish a violation of the statute. *Scaife,* 446 F.3d at 741 (*citing Cowan v. Glenbrook Sec. Servs., Inc.,* 123 F.3d 438, 444 (7th Cir.1997)).

2.    <u>Indirect Evidence</u>

In the absence of direct evidence, a plaintiff must establish a prima facie case of discrimination based on circumstantial evidence under an adaptation of the *McDonnell Douglas* analysis. *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Under the circumstantial evidence approach, a plaintiff must establish a *prima facie* case of retaliation under Title VII by showing that:

a.    plaintiff engaged in statutorily protected activity;

b.    plaintiff was performing the job according to the employer's legitimate expectations;

c.    plaintiff suffered a materially adverse action;

d.    plaintiff was treated worse than a similarly situated employee who did not engage in statutorily protected activity.

*Scaife v. Cook Co.*, 446 F.3d 735, 741-42 (7th Cir. 2006) (*citing Firestine v. Parkview Health Sys., Inc.,* 388 F.3d 229, 233 (7th Cir.2004)).

In order for a plaintiff to show she is "similarly situated" to a comparable individual who has not engaged in statutorily protected activity, the plaintiff is required to prove that all of the *relevant* aspects of her employment situation were nearly identical to those of the comparable individual's employment situation. *Keri v. Board of Trustees of Purdue University,* 458 F.3d 620, 644 (7th Cir. 2006) (citations omitted).

To be deemed "similarly situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Keri,* 458 F.3d at 644 (citations omitted).

If a plaintiff establishes a prima facie case based on circumstantial evidence, "the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action." *Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 531 (7th Cir. 2003) (*citing Stone,* 281 F.3d at 644).

The defendant's burden is one of production, not of persuasion. *Haywood,* 323 F.3d at 531 (*quoting Klein v. Trustees of Indiana Univ.,* 766 F.2d 275, 280 (7th Cir.1985)).

If the defendant carries this burden, then the plaintiff must prove that the proffered reason was a mere pretext by showing that:

a.     The stated reasons had no basis in fact;

b.     The stated reasons were not the actual reasons; and

c.     The stated reasons were insufficient to explain the defendant's actions.

*Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 784, 788-89 (7th Cir. 2004) (*citing Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1006 (7th Cir.2002) (*citing Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1012 (7th Cir.2000))).

Unlike the defendant's burden of production, the plaintiff has the "ultimate burden of persuading the factfinder that the defendants' proffered reason is pretextual and that he was actually the victim of intentionally discriminatory conduct." *Vitug v. Multistate Tax Com'n,* 88 F.3d 506, 515 (7th Cir. 1996) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507-08 (1993)).

### Plaintiff Has No Direct Evidence

Plaintiff has *no* direct evidence to support her retaliation claim, nor can she show that the filing of an EEOC charge in May 2002 was a "motivating factor" in her termination. There is no link nor nexus between any alleged statement or conduct by any decision maker at Guardsmark and plaintiff's claim of wrongful termination. The decision makers in this matter, Michael Jankovsky and Jeremy Baumann, are not alleged to have engaged in any discriminatory conduct of any kind. In fact, the best the plaintiff could muster in her deposition in this regard was to testify at page 47 (Exhibit 2, p. 47) that her immediate supervisor, Scott Furlong (who was not a decision maker and had already tendered his resignation from Guardsmark prior to plaintiff's termination; *see*, p. 4, paragraph 14 above), told her that he had been told by Michael Jankovsky that her May 2002 EEOC Charge was going to be closed by the EEOC. Even if this were true, so what? That statement of fact, which plaintiff admits as true, does nothing to establish any nexus whatsoever between any protected activity in which she participated and her subsequent termination. Whether the EEOC was closing its case file or not is not relevant to this lawsuit,

nor is any statement in that regard attributed to Jankovsky through hearsay testimony any evidence of anything.

### Plaintiff Has No Indirect Evidence

Furthermore, plaintiff cannot establish a *prima facie* case of retaliation, nor that the reason stated for her termination was mere pretext. "A plaintiff can establish pretext either directly, with evidence suggesting that retaliation or discrimination was the most likely motive for the termination, or indirectly, by showing that the employer's proffered reason was not worthy of belief." *Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999) (*citing Johnson v. Sullivan*, 945 F.2d 976 n.5 (7th Cir. 1991)). "The indirect method requires some showing that (1) the defendant's explanation has no basis in fact, or (2) the explanation was not the 'real reason', or (3) ...the reason stated was insufficient to warrant the [termination]." *Id.* (*quoting Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996))(alterations in original). The documentary evidence and sworn testimony of Jankovsky and Baumann about the termination decision has not and cannot be challenged by plaintiff as having no basis in fact. In short, plaintiff cannot establish that the stated reasons for her termination are not the actual reasons. Nor can plaintiff establish that her filing of an EEOC charge of discrimination in May 2002 played any role whatsoever in her termination some five months later. *Filipovic v. K & R Express Systems, Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (*quoting Johnson v. Univ. of Wis. Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995)) (holding that the employee could not establish a causal link between the EEOC charge and the termination because four months had passed between the two events and "[a] substantial time lapse between the protected activity and the adverse employment action 'is counter-evidence of any causal connection'"); *see also Longstreet v. Illinois Department of Corrections*, 276 F.3d 379, 384 (7th Cir. 2002) (holding that evidence that the adverse

employment action occurred four months after the harassment complaint was made is insufficient to establish a causal connection between the two events). And, plaintiff has no evidence of any kind to reflect that she was treated differently than any similarly situated employees.

## CONCLUSION

For the reasons articulated, this matter should be dismissed.

GUARDSMARK, LLC


BY:  s/William P. Dougherty
        WILLIAM P. DOUGHERTY
BAKER, DONELSON, BEARMAN, CALDWELL
  & BERKOWITZ, P.C.
First Tennessee Building, Suite 2000
165 Madison Avenue
Memphis, Tennessee 38103
Direct No. 901-577-2340/Direct Fax: 901-577-0789
E-mail: wpdougherty@bakerdonelson.com

**ATTORNEYS FOR DEFENDANT**


## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2007, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail.


s/ William P. Dougherty
WILLIAM P. DOUGHERTY

E-FILED
Tuesday, 01 May, 2007  01:33:01 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| SANDRA TREVINO HESTON, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| GUARDSMARK, INC. | ) |
| | ) |
| **Defendant.** | ) |

Case No. 06-1172

## AFFIDAVIT OF MICHAEL W. JANKOVSKY

Michael W. Jankovsky, being above the age of 18, does hereby state under oath of his own personal knowledge:

1.    My name is Michael W. Jankovsky.

2.    In October of 2002, my title at Guardsmark was Manager in Charge of the Peoria branch for Guardsmark.

3.    In that capacity, my general duties consisted of overseeing and managing all aspects of the Peoria branch, which included the Joliet area accounts.

4.    Guardsmark is a company which provides security services to its worldwide clients. Guardsmark has locations throughout the United States, which included in 2002 the Inland Steel Company in East Chicago, Indiana; the Caterpillar facility in Joliet, Illinois; and a facility referred to as Cat Logistics also located in Joliet, Illinois.

5.    In July 2001, Guardsmark's site supervisor Anthony T. Pedigo was advised by Caterpillar Security Chief William Smith that Caterpillar did not want Sandra

1

Heston to return to active duty at the Caterpillar Joliet facility. Attached to this affidavit as Attachment 1 is a true and correct copy of an internal Guardsmark incident report, a document kept in the ordinary course of Guardsmark's business, which specifically refers to the meeting between Pedigo and Smith.

6.  As a result, Ms. Heston was transferred to the Cat Logistics facility; she was paid more money per hour than any other security officer at that facility; and, in fact, was paid the same hourly wage as the then current site supervisor, Scott Furlong.

7.  During the course of her employment at Guardsmark, plaintiff received numerous write-ups and other disciplinary actions. Attached to this affidavit, as collective Attachment 2, are copies of some of the written documentation evidencing performance related problems from Ms. Heston's personnel file.

8.  Attached to this affidavit as Attachment 3 is a true and correct copy of the resignation notice tendered by Lt. Scott Furlong who was the site supervisor at the Cat Logistics facility. Lt. Furlong's resignation specifically cites problems created by Sandra Heston's attendance problems while working at the Cat Logistics plant.

9.  Attached to this Affidavit as Attachment 4 is a true and correct copy of a termination letter to Sandra Heston dated October 17, 2002 which I signed. Ms. Heston was terminated for the reasons set out therein.

FURTHER, THE AFFIANT SAYETH NOT.

MICHAEL W. JANKOVSKY

<u>VERIFICATION</u>

I, Michael W. Jankovsky, do hereby state that the foregoing is true and correct to the best of my knowledge and belief.

_____
MICHAEL W. JANKOVSKY

. State of

County of

SWORN TO AND SUBSCRIBED before me this _30_ day of _Apr. 1_, 2007.

_____
Notary Public

My Commission Expires:

_5-20-2007_

OFFICIAL SEAL
HEATHER DOTY
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-20-2007

- 3 -

ATTACHMENT 1

# Guardsmark
## Incident Report

**Officer:** Sandra Heston          **Date:** July 16, 2001

**Nature of Incident:** Request by Caterpillar Security Chief William Smith to not allow Guardsmark officer Sandra Heston to return to active duty at the Caterpillar Joliet facility.

**Narrative:**

On the morning of Friday, July 13, 2001 Site Supervisor Anthony T. Pedigo had a meeting with Chief Bill Smith. During the meeting Chief Smith stated he had met with Human Resource Manager Mark Shipley and the decision was made to not allow officer Heston back to duty. The reason given was that they need a person that can be safety minded and dependable to be at work.

During the period of January 1, 2001 through July 13, 2001 officer Heston was scheduled to work 98 twelve hour shifts. Due to injury while on duty with another employer and alleged injury while on duty at Caterpillar Joliet, officer Heston was counted absent forty two days due to injury with other employment and missed five days due to an alleged injury at Caterpillar Joliet. Officer Heston also missed six days taking vacation time. Officer Heston was late to work three times, totaling eight and a half hours, left work early once totaling one and a half hours, and left work and returned once totaling six and a half hours.

| | |
|---|---|
| TOTAL DAYS SCHEDULED (12 hr. shift): | 98 days |
| INJURY OUTSIDE CATERPILLAR: | - 42 days |
| ALLEGED INJURY AT CATERPILLAR: | - 5 days  90 |
| VACATION: | - 6 days |
| TOTAL DAYS WORKED: | 45 days |

*Unbilled OT*

| | |
|---|---|
| LATE: | - 8.5 hours |
| LEFT EARLY: | - 1.5 hours |
| LEFT EARLY & RETURNED: | - 6.5 hours |
| TOTAL HOURS MISSED LATE/LEFT EARLY: | 16.5 hours |

| | |
|---|---|
| TOTAL DAYS ACTUALLY WORKED: | 43 days 7.5 hours |

NOTE: All time missed had to be filled as overtime by both Caterpillar and Guardsmark officers.

Prepared by: _[signature]_

ATTACHMENT  2

7 Mar 02
David Patel
Guardsmark Unit Manager


To: Officer Sandra Heston

I would like to respond to your original E mail to Lt Bohlen dated 6 Mar 02 in which Kathy Whitten was cc'd. The policy on training at CLS is one in which Guardsmark is trying to be proactive in, and implement additional training for, our client. This is something that is new to this particular facility and therefore not offered at CLS at this time. Travel time to and from training will not be reimbursed at this time. Future classes will be more selective and will not happen on a regularly scheduled basis. We do not feel that there is an undue amount of burden to attend a paid training event for this reason. The weather class specifically may not have pertained to the account in your opinion however it was a timely effort to show the client our good faith.

Reason #2 for this memo concerns the information flow to the client ie Kathy / Krista. Kathy and I have discussed that while she wishes to be cc'd on issues that deal with her facility, she does not nor should she be, cc'd on internal Guardsmark affairs. I honestly feel that this was probably a point that was not fully understood by you at the time of our meeting. Now however, I want you to be chrystal clear that if it happens again I will feel that you would be placing an already volatile account into too great of danger. This action would leave me with no choice but to dismiss you.


Please sign below that you have read, understand and will comply with the contents of this memo.

_Sandra Heston_        3-13-02

Signature/ Date

DEPOSITION
EXHIBIT
2
1-24-07 JP
PENGAD 800-631-6889

EXHIBIT D

FEB-10-2003 08:55     3096740438     %9     P.02     \*\* TOTAL PAGE.02 \*\*

# GUARDSMARK®
### Record of Counseling

Security Officer: SANDRA HESTON          Date: 9/17/02          Time: 6:00AM

Nature of Counseling: ATTENDANCE / TARDINESS

**NOTE: In the narrative, supervisors will include the nature of the counseling session, the recommended plan of action and recommended disciplinary actions (if any).**

ON THURSDAY 9/12/02 OFCR HESTON DID NOT SHOW UP FOR WORK UNTIL 1230 AM. THIS WAS 90 MINUTES AFTER HER SCHEDULED START TIME. A PHONE CALL WAS RECEIVED EARLIER IN THE EVENING STATING THAT OFCR HESTON WAS ON A FIRE CALL AND WOULD BE LATE. HOWEVER, THIS DOES NOT CHANGE THE FACT OF TARDINESS AND CREATION OF UNBILLED OVERTIME.

Signature of Employee:_____  Date:_____

Signature of Supervisor:_____  Date:_____

Page _1_ of _1_

C:Counseling

FEB 10 2003 08:51     FR GUARDSMARK INC     3096740438 TO 19015527911     P.02/02

**SPECIAL REPORT FORM**

| | | | | |
|---|---|---|---|---|
| DATE 5-11-99 | TURN 3rd | TIME 450 AM/PM | | |

| PAñACeño Bruce | 912857 | Fire. | 2106 | Firefighter |
|---|---|---|---|---|
| COMPLAINANT | PAYROLL NO. | DEPARTMENT | EXT. | JOB TITLE |

| INCIDENT: | ALARMS ☐ | ALCOHOL/ DRUGS ☐ | FIGHT ☐ | FIRE CALL ☐ | ILLNESS OR INJURY ☐ | INSUBORDINATION ☐ |
|---|---|---|---|---|---|---|

| LOCKER OPENING ☐ | OUT OF WORK AREA ☐ | PROPERTY DAMAGE AND DESTRUCTION ☐ | SAFETY VIOLATION ☐ | SLEEPER ☐ | COMPANY THEFT ☐ | PERSONAL THEFT ☐ |
|---|---|---|---|---|---|---|

UNSECURED AREAS ☐   VENDING ☐   OTHER: Playing Video Game

| Fire Station Ems 123 | S. Heston 545223 | R. Czajkowski 844828 |
|---|---|---|
| LOCATION | NAME(S) PAYROLL NO.(S) OF PERSON(S) INVOLVED | WITNESSES NAME(S) PAYROLL NO.(S) |

REMARKS:  After Returning from giving Lt Dispatcher, Richards Relief I walked past the Deck in the fire station where I saw Firefighter TRAINEE S. Heston Playing a purple colored Video Game (GameBoy). I Advised her that VIDEO Game playing was Not Allowed & to Put game Away, she stated "NO

over     Bruce D. Telifo 912397

OFFICERS NAME & PAYROLL NO.

S-39202 REV. 2/87          WHO, WHAT, WHERE, WHEN, HOW, WHY

WAY!  I Asked her Again to Put the Game Away & she refused. At that Point I called Lt. Reillo & Asked him to come to the fire station.

B. Telifo
912397

**SPECIAL REPORT FORM**

| DATE | TURN | TIME |
|------|------|------|
| 5/11/99 | 3 | 1715 AM/PM |

| COMPLAINANT | PAYROLL NO. | DEPARTMENT | EXT. | JOB TITLE |
|-------------|-------------|------------|------|-----------|
| Sandra Richards | 544608 | Plant Security | 3334 | Disp. LT |

**INCIDENT:**

ALARMS ☐    ALCOHOL/DRUGS ☐    FIGHT ☐    FIRE CALL ☐    ILLNESS OR INJURY ☐    INSUBORDINATION ☐

LOCKER OPENING ☐    OUT OF WORK AREA ☐    PROPERTY DAMAGE AND DESTRUCTION ☐    SAFETY VIOLATION ☐    SLEEPER ☐    COMPANY THEFT ☐    PERSONAL THEFT ☐

UNSECURED AREAS ☐    VENDING ☐    OTHER: _Conversation_

| LOCATION | NAME(S) PAYROLL NO.(S) OF PERSON(S) INVOLVED | WITNESSES NAME(S) PAYROLL NO.(S) |
|----------|-----------------------------------------------|----------------------------------|
| Plant Security | | |

**REMARKS:** On Above date And Time T.C. Reillo said That he was sending S. Heston home. And she will Return her next schedule Turn. officer Heston stated That she wanted To talk To Lt. Davis or Chief Brown. She Also Ask For Mr. Hammer Pager #. I do Not give out Anyone. home Phone # or Pacer # To Any officer.

Dup. Sandra Richard 544608
**OFFICERS NAME & PAYROLL NO.**

S-39202 REV. 2/87

WHO, WHAT, WHERE, WHEN, HOW, WHY

# GUARDSMARK.

## INSPECTION REPORT

Period 12:01 A.M. to 12:00 Midnight

200295

GMF 317A

Day of Week: _TUESDAY_
Month: _MAY_  Date: _11_ 19 _?_

Report of _LT. il NEICC._

| OPERATION | SECURITY OFFICERS ON DUTY | Time Inspection Covered | | 1 | 2 Emergency Phone Instructions Available | 3 Uniform Equipment Appearance Satisfactory | 4 Knowledge of Equipment | 5 Performing Duties Properly | SIGNATURE OF SECURITY OFFICER I CERTIFY THAT I PERSONALLY SIGNED THIS FORM AT THE TIME AND DATE OF THE INSPECTION AS SHOWN HEREON. |
|---|---|---|---|---|---|---|---|---|---|
| | | From | To | | | | | | |
| FINAT/Fulsur | S. Heston | 500 SVS | | B | YES | YES | YES | YES | William Hostey |

DETAILS OF COMPLAINTS, VIOLATIONS OF GENERAL ORDERS AND REGULATIONS, AS EXPLAINED TO THE SECURITY OFFICER, OR SUGGESTIONS RELATED TO THE GUARDSMARK WORLD CLASS SERVICE LEADERSHIP AWARD. HAVE THE SECURITY OFFICER INITIAL AT THE END OF THE EXPLANATION OR SUGGESTION.)

Mayie 6 a video 6976
NOTE NOT

**ACTION TAKEN OR RECOMMENDED**

SELT HOME FOR
BALANCE OF TEXXO.
Section 5.25 Hours

I certify that all the security officers listed were inspected, found on their posts, and properly performing their duties and observing the general orders and regulations; except as reported. I further certify that each security officer was in proper uniform unless noted otherwise, and that each security officer signed this form in my presence at the time and date he/she was inspected.

A. Hest Neill

Inspector

SECURITY OFFICER: Heston, S

| EXAMINED BY | | |
|---|---|---|
| Unit Manager | Manager in Charge | Regional Manager |
| Date Stamp & Initial | Date Stamp & Initial | Date Stamp & Initial |

# MEMO FOR RECORD

TO:       File

FROM:   Mike Jankovsky

DATE:    2/16/01

RE:       <u>PERFORMANCE REVIEW</u>

This memo for record is a summary of Sandra Heston's performance over the time period of 3/13/00 through 2/16/01.

While on post, officer Heston has worked several extra days and has been willing to help cover open positions. Officer Heston is properly uniformed and presents a clean and neat image.

Despite the above listed qualities, officer Heston has had some notable deficiencies. Attached to this memo-for-record are (5)-recorded incidents documenting officer Heston's inadequate performances. The following summarizes the attached incident reports:

| | | |
|---|---|---|
| April 30, 2000 | - | Guardsmark officer being disruptive |
| May 29, 2000 | - | Guardsmark officer committing falsification of orders |
| June 1, 2000 | - | Guardsmark officer failed to respond to smoke detector alarm with fire truck |
| September 27, 2000 | - | Council for foul and abusive language |
| November 21, 2000 | - | Breach of Command |

Site Supervisor Anthony Pedigo has documented Sandra Heston being late 10 times and absent 4 times during the period of 3/13/00 through 2/16/01. This does not include leaves or vacations. Due to an injury on site, Officer Heston was on medical leave from June 13, 2000 to July 30, 2000. Also, but due to an injury off-site, officer Heston was on a medical leave of absence from November 20, 2000 through February 16, 2001.

There is also a concern of officer Heston's overall ability to work with both her supervisor and fellow officers. Site Supervisor Anthony Pedigo has reported various occasions where officer Heston has acted uncooperative and insubordinate.

The above listed performance deficiencies are material and of great concern. If in the next 90 days, officer Heston continues to display any of the above listed deficiencies, disciplinary action may be required.

FEB- 5-01 MON 4:46 PM  CATERPIL METROPOL

02/01/01  THU 14:03 FAX                                                    ☑002

# GUARDSMARK
## INCIDENT REPORT

LOCATION: Caterpillar Joliet

DATE: April 30, 2000

TIME OF INCIDENT: 06:20

DESCRIPTION OF EVENT: Guardsmark officer being disruptive

REPORT OF: Lt. Anthony Pedigo

DATE OF REPORT: April 30, 2000

TIME OF REPORT: Notes taken at time of incident, report typed at 20:00

### NARRATIVE

Officer Anthony Pedigo reported for duty to Caterpillar Joliet C gate at 06:20, 4 / 30 / 2000. When I arrived, officer Sandra Heston informed me that officer Aaron Young had some questions for me and that he would like me to call him at the main gate. I placed a call to Aaron Young at the main gate at 06:25. Officer Young wanted to know if there was a time period after 06.30 or 18:30 where we are not counted tardy, because the Caterpillar officers have five minuets before they are counted late. I informed officer Young that if a Caterpillar officer is late they are counted late, but they have a five-minuets buffer before Caterpillar begins to dock their pay. I then informed officer Young that nowhere in the G.O.R.I. book or in our post orders does it allow for a buffer time from being counted late. I then told officer Young that I expect all the Guardsmark officers to be at their post in proper uniform on time. Officer Young then thanked me for my time and the conversation ended. After hanging up the phone officer Sandra Heston immediately stated that "at the location she had transferred from the Lieutenant there had allowed the officers there up to four minuets to be late, and that it was bullshit that I didn't allow any leniency." Heston then asked how I handled tardy discipline. I informed Heston that If I witness, receive complaints from other officers, or complaints from the client, I investigate the situation. If I find that an officer has been tardy, that officer receives a verbal warning. If the behavior continues, the officer receives a written warning. After a written warning, the officer will be given time off and eventually terminated if the behavior continues after that. Heston expressed that she felt that if an officer is late the officer should only be docked the money for the time they missed and that no further action should be taken. Heston then made the statement "for all the things the other officers get away with around here, if I ever try to discipline her she will sue me and Guardsmark." I then informed Heston I felt that the Guardsmark officers at this location don't get away with anything. Heston then left C Gate at 06:39

*[signature]* 4·30·0

# GUARDSMARK
## INCIDENT REPORT

LOCATION: Caterpillar Joliet

DATE: May 29, 2000

DESCRIPTION OF EVENT: Guardsmark officer committing falsification of orders

REPORT OF: Lt. Anthony Pedigo

DATE OF REPORT: June 4, 2000

### NARRATIVE

While on duty During the day of June 1, 2000, a Caterpillar officer notified me that the janitor that cleans C gate complained to him on May 30, 2000 that officer Sandy Heston repeatedly harasses her while she cleans C gate. I informed the Caterpillar officer that I would look into the situation. At 18:15 on June 1, 2000 a Guardsmark officer stated that they wanted to come in early and make me aware of a situation that the officer had witnessed on May 29, 2000. The officer informed me that officer Sandy Heston had told the janitor to clean a closet at C gate that the janitors are not responsible to clean. When the janitor told Heston she didn't have to clean the closet Heston stated "*my supervising officer told me to tell you to clean the closet, so clean it.*" The informing officer stated that Heston had used Caterpillar Captain Scott Favero, or my name. The officer couldn't remember which. The officer also told me Another Caterpillar officer had witnessed the incident also. I told the officer I would look into the situation and speak to the other officer who had witnessed the incident. On June 2, 2000 I spoke with the janitor who was involved. The janitor stated that Heston regularly bothers her at C gate by telling her she misses spots and won't move when the janitor needs to clean the floors. When asked about the incident on May 29, 2000 the janitor stated she wasn't sure what name Heston used. I then asked if Captain Scott Favero or Lieutenant Anthony Pedigo sounded familiar. The janitor stated that she thought Heston had used Anthony Pedigo. At 18:30 June 2, 2000 I spoke with the Caterpillar officer who was said to of witnessed the incident. The officer described the incident very similarly to the janitor's and other officer's version, but the officer thought maybe Captain Favero's name had been used. On the morning of June 3, 2000 I asked Captain Favero if he had ever given Heston the permission to tell the janitors to clean the closets at C gate. Favero stated that he had not spoken to Heston ever about the janitors, and that the news of the incident on May 29, 2000 had gotten back to him also. I informed Favero of my findings and told him that I had also never given my people permission to have the closets cleaned. I then told Favero that I wanted to pursue falsification of orders against Heston. Favero agreed.

6/4/00

FEB- 5-0. MON  4:48 PM  CHICAGO METRO          FAX NO.  630 971 1150              P. 7

02/01/01  THU 14:05 FAX                                                    @006

# GUARDSMARK
## INCIDENT REPORT

LOCATION: Caterpillar Joliet

DATE. June 1, 2000

TIME OF INCIDENT: 04:31

DESCRIPTION OF EVENT: Guardsmark officer failed to respond to smoke detector alarm
                      With fire truck

REPORT OF: Lt. Anthony Pedigo

DATE OF REPORT: June 1, 2000

### NARRATIVE

When arriving for duty on June 1, 2000 I was approached by a Caterpillar Fire Inspector who informed me that officer Sandy Heston had failed to respond to a smoke detector alarm in the D building hydraulic testing area with the fire engine. Any time a smoke detector, manual fire alarm, water flow alarm, or an employee reports fire or smoke in an area the officer called to respond must take the fire engine to the reported location immediately. Delay in the fire engines arrival may lead to increased financial and / or life loss for our client. It was also reported that Heston repeatedly called the CRO for instructions on how to get to the site of the fire.

6/1/00

P. 04

# GUARDSMARK

## INCIDENT REPORT

LOCATION: Caterpillar Joliet

DATE OF INCIDENT: September 27, 2000

DESCRIPTION OF EVENT: Council for foul and abusive language

DATE OF REPORT: October 9, 2000

### NARRATIVE

It was brought to my attention by a Caterpillar officer that on September 30th officer Heston used profanity over the 2-way radio system. The officer stated that he was not there that night, but he heard about the incident and felt that I should know about it. I interviewed the other 3 officers that worked with Heston that night. 2 of the 3 officers confirmed that the action did take place. The third officer did not hear Heston on the radio. The 2 officers that did hear Heston stated she was speaking about the new scanner system and had stated something to the effect of " this piece of shit doesn't work".  On October 9th I brought to Heston's attention that she had already been warned by myself and Frank McCollough that she needed to control her use of abusive and foul language. I then counseled Heston further about her language and that I receive regular comments about her use of language and uncooperativeness to work well with others. Heston conveyed that if people didn't like her personality that was too bad, and did not comment about her language. I informed Heston that if I had any more complaints about her language that there would be further action taken against her.

OCT. 9 2000

FEB- 5-01 MON  4:43 PM  CHICAGO METRO

02/01/01  THU 14:05 FAX                                      @005

# GUARDSMARK
## INCIDENT REPORT

LOCATION  Caterpillar Joliet

DATE OF INCIDENT  November 21, 2000

DESCRIPTION OF EVENT: Breach of command

DATE OF REPORT: November 23, 2000

### NARRATIVE

On Tuesday November 21, 2000 officer Sandra Heston broke Guardsmark chain of command by unnecessarily contacting a representative of the client and not reporting to her immediate Guardsmark supervisor before taking further action. Officer Heston called Caterpillar security chief Bill Smith from home to follow up on if Anthony Pedigo had contacted him, or if any decision had been made concerning the 2 hours she lost due to having to leave work to change clothes on November 14th. Heston was told that was *Guardsmark business and that she needed to contact Anthony Pedigo.* Heston then called me at C Gate. Heston told me that she had talked to Smith and he told her to call me. Heston then began to ask me about items that I had already answered for her previously. Heston would not accept any of my answers and would not cooperate with directions I gave her. I then instructed Heston to contact Dean Donely because the conversation was going nowhere. After our conversation ended I followed up with Bill Smith and confirmed with him that Heston had called and questioned him about the missing hours.

NOV 23, 2000

35%                    P. 07

ATTACHMENT  3

October 9,2002

      Effective October 24, 2002 I will be terminating my employment with Guardsmark.  After that date, I will be available, by telephone, to answer any questions that my replacement may have reguarding the CLS account.  There is one main reason that I will be resigning at this time.  That reason is the complete lack of off-duty time that my position provides.  There are two main causes of this lack of off-duty time.  The first is something that the client would need to do something about and the second is something that Guardsmark refuses to do something about.  The client requires that the Lieutenant is available by Nextel on a 24/7 basis for emergency calls.  This is a reasonable request by the client.  However, some members of management feel that being out on the shop floor and needing to know someone's extension or whereabouts in the building is an emergency.  The problem that Guardsmark refuses to deal with is the attendance of the midnight officer in this facility.  Adapting to working midnights with a few hours notice is extremely difficult especially when the management at CLS pages me for non-emergency reasons while I am trying to get enough sleep in order to cover.

Lieutenant Scott Furlong
Guardsmark CLS Joliet, IL



**GUARDSMARK·**

ATTACHMENT 4

Guardsmark, Inc.
207 Main Street Suite 305
Peoria IL 61602-1323 USA
Telephone 309 674 0430
Telefax    309 674 0438

October 17, 2002

Ms. Sandra D. Heston
2802 W. 39ᵗʰ Place
Gary, IN 46408

This letter is to advise you of your termination. This action is based on the following reasons:

In July 2001, you were removed from Caterpillar Joliet Rt. 6 because of client concerns regarding your attendance and performance. Nonetheless, Guardsmark provided you with another opportunity to succeed in you employment by placing you at another facility at your same wage rate.

Your attendance over the last 12 months included 16 call offs and 34 late arrivals. *(This contrasts the 1 call off and 7 late for the other two officers <u>combined</u> for the same time period.)* This is a violation of GOR&I General Orders, Paragraph 14 &16.

In March 2002, you received a written disciplinary action based on your poor client interaction, violation of chain of command and refusal to follow orders. This is a violation of GOR&I General Orders, Paragraph 5.

On August 27, 2002, you received sub-standard marks on your yearly review in attendance and communications. However, Guardsmark staff continued to work with you to improve your problem areas and still receive your raise by placing you into an evaluation period with specific measurable goals which, if attained, would still yield the appropriate pay raise, even though you are well above standard pay at that facility. This is a violation of GOR&I General Orders Paragraph 14 & 16.

On August 27, 2002, you lied directly to Mike Jankovsky, Manager in Charge, Peoria, and Jeremy Baumann, Unit Manager, saying that the client had given you a "glowing" review. Subsequent investigation revealed the client never reviewed you at all. This is a violation of the Code of Ethics.

Your attendance was so poor that it was cited by Lt. Furlong as a major contributing factor to his resignation, which was submitted on 10-10-02. You were to receive a last chance letter concerning attendance on 10-14-02. However, before such a letter was issued, Guardsmark was made aware of the following misconduct and rule violations:

1) Allowing a CLS employee on facility with odor of alcohol on breath.
2) Loaning your personal vehicle to a CLS employee.
3) Taking a report home to finish it. This is a violation of GOR&I Regulations Paragraph 9.
4) Multiple substantiated complaints on attitude & demeanor. This is a violation of GOR&I Regulations Paragraph 3a.

As a result of these actions and your poor attendance, the client at Caterpillar Joliet CLS has requested that you no longer be assigned to the CLS facility.

Guardsmark has given you numerous opportunities to succeed in your employment. You have consistently violated Guardsmark policies and procedures. Therefore, Guardsmark is terminating your employment effective immediately. Please make arrangements to return all Guardsmark property by October 25, 2002. Your last check will be delivered to you via U.S. Mail to the above address.

Jeremy M. Baumann
Unit Manager, Guardsmark, Inc.

Michael W. Jankovsky
Manager in Charge, Guardsmark, Inc.

EXHIBIT __F__

E-FILED
Tuesday, 01 May, 2007  01:33:32 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 2

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

SANDRA TREVINO-HESTON,      )
                            )
      Plaintiff,            )
                            )
      vs                    )   CASE NO. 06-1172
                            )
GUARDSMARK, INC.,           )
                            )
      Defendant.            )

The deposition of SANDRA D. TREVINO-HESTON, having

been called as a witness by the Defendant, pursuant to

Notice of Deposition, at the office of Herbert S. Lasser &

Associates, 3700 East U.S. 30, Suite 5, Merrillville,

Indiana, on Wednesday, January 24, 2007, and commencing at

the hour of 10:00 a.m.

      This deposition was reported by TERRY M. PICKERING, a

duly authorized shorthand reporter and duly commissioned

officer of the State of Indiana.

**KAREN M. PRICE & ASSOCIATES**
Computer-Assisted Reporters
7863 Broadway, Suite 118
Merrillville, IN  46410
(219) 756-0702

11

| | | |
|---|---|---|
| 1 | Q. | All right. My recollection is that you went to work for |
| 2 | | Guardsmark in 1999. |
| 3 | A. | Yes, in January. |
| 4 | Q. | Is that right? |
| 5 | A. | Yes, in January. |
| 6 | Q. | All right. And you were a security officer? |
| 7 | A. | Firefighter. |
| 8 | Q. | Firefighter. And where were you stationed? Where did you |
| 9 | | work in 1999? |
| 10 | A. | In the fire station at Inland Steel for Guardsmark. |
| 11 | Q. | Inland Steel? |
| 12 | A. | Yeah, ISPAT Inland. Yes. |
| 13 | Q. | And where is that facility located? |
| 14 | A. | East Chicago, Indiana. |
| 15 | Q. | And how long did you work at that facility as a fire person, |
| 16 | | fireman? |
| 17 | A. | Less than a year. |
| 18 | Q. | And what happened? |
| 19 | A. | As to like why I'm not working there? |
| 20 | Q. | Did you transfer from that station to another one? |
| 21 | A. | Yes. I was transferred after a complaint. |
| 22 | Q. | What kind of complaint? |
| 23 | A. | Sexual and wage. |
| 24 | Q. | A complaint that you filed? |
| 25 | A. | Yes. |

```
 1  Q.  All right.

 2  A.  With the union and the EEOC.

 3  Q.  All right.  And you were transferred to where?

 4  A.  I was transferred to Guardsmark's account at Caterpillar in

 5      Joliet, Indiana --  Illinois.  I'm sorry.

 6  Q.  All right.  And when would that have been?

 7  A.  I guess either at the end of '99 or in 2000.

 8  Q.  All right.  Now who was your supervisor at the Inland plant

 9      in East Chicago?

10  A.  My supervisor was Dave Brown for Guardsmark.  And then there

11      was another supervisor, but I can't recall his name, an

12      Hispanic man.  And then my Inland Steel employer was Homer

13      Brown.  He was head of plant security and fire.

14  Q.  All right.  But you acknowledge, do you not, that you

15      have -- during this time we're talking about, you've been an

16      employee of Guardsmark?  You were not an employee of Inland

17      Steel.

18  A.  I was a contractor, right.  Yes.

19  Q.  Through Guardsmark?

20  A.  Through Guardsmark, yes.

21  Q.  Okay.  All right.  Now who transferred -- who was the person

22      who transferred you from the Inland Steel plant to the

23      Joliet plant?

24  A.  That's the man I cannot recollect.  He was an Hispanic man.

25      I can't remember his name.
```

KAREN M. PRICE & ASSOCIATES
(219) 756-0702

14

| 1 | A. | Yes. |
| 2 | Q. | And who was your supervisor at Joliet, the Guardsmark |
| 3 | | supervisor? |
| 4 | A. | Pedigo, I believe.  Maybe Officer Pedigo.  Anthony Pedigo. |
| 5 | Q. | And how long did you work at Joliet? |
| 6 | A. | Between one and two years. |
| 7 | Q. | And then you moved again from Joliet? |
| 8 | A. | Yes. |
| 9 | Q. | To where? |
| 10 | A. | Just a couple blocks away from there to a Caterpillar plant, |
| 11 | | a smaller one.  It was called Cat, CLS or Cat Logistics. |
| 12 | Q. | Okay.  And about when would you have been transferred to Cat |
| 13 | | Logistics? |
| 14 | A. | I want to say in '01. |
| 15 | Q. | Okay.  Who told you or asked you to -- you tell me which of |
| 16 | | the two it was -- transfer to Cat Logistics? |
| 17 | A. | Well, when I came back off some medical leave, I was told by |
| 18 | | the supervisor that I was going to be transferred. |
| 19 | Q. | Was that Pedigo? |
| 20 | A. | I don't know if it was Pedigo or the one above him.  It |
| 21 | | might have been Jankovsky.  I'm not sure if it was Mike at |
| 22 | | that time or not.  I want to think I met Mike Jankovsky in |
| 23 | | CLS, but I might have known him from -- I can't remember. |
| 24 | Q. | All right.  You were off work for a period of time in |
| 25 | | Joliet. |

KAREN M. PRICE & ASSOCIATES
(219) 756-0702

15

1   A.   Yes.

2   Q.   For what?

3   A.   I had two injuries that were pretty close together.  On my

4        volunteer fire department a -- CBA Retreader is a truck out

5        of Griffith -- hit our fire truck and I went through the

6        front windshield and I hurt myself.  And per Guardsmark, I

7        had to show medical necessity for time off and had to send

8        in, like, physical therapy reports and had to, you know --

9        so I sent in all my papers for time off.  And as soon as I

10       could come back, I did.

11  Q.   All right.  You were off work for a period of time while you

12       were stationed at the Caterpillar Joliet plant --

13  A.   Yes.

14  Q.   -- because of injuries you sustained in your volunteer fire

15       job.

16  A.   Yes.

17  Q.   And about how long a period of time were you off?

18  A.   I want to say between two and three months.  I don't know.

19       It could have been shorter or longer.  I'm not really for

20       sure.

21  Q.   And tell me again about how -- did you say you worked at

22       Joliet for between one and two years?

23  A.   I think so.  Maybe a little over a year.

24  Q.   Okay.

25  A.   Somewhere in there.

16

1  Q.  You were released to return to work, I assume.

2  A.  And I had an accident at Caterpillar.

3  Q.  Okay.  Right after you came back to work?

4  A.  Shortly after, yes.  I came back and stepped off a cart that

5      we use for security in the background and I stepped in a

6      hole of -- it was like broken concrete.  And I hurt my ankle

7      pretty bad.

8  Q.  All right.  And how long were you off from your job for that

9      injury?

10 A.  Maybe a week or so.  They put me in a walking boot, and I

11     came back to light duty as long as they would have me.  I

12     came back as quick as I could.

13 Q.  And "light duty," meaning that you were not able to make

14     your rounds; you were not able to --

15 A.  I could work at the C --

16 Q.  -- climb stairs and things like that?

17 A.  Yes, I worked at the CRO desk, the front desk, instead of

18     all the other gates.

19 Q.  Whereas, ordinarily, among other things you would do would

20     be to make rounds, check fire equipment, check people coming

21     in and out throughout the plant?

22 A.  Not every day.  You're assigned a certain gate to work at.

23     And so being on light duty, they just assigned me at the

24     gate where I would be sitting instead of walking around.  If

25     I was at gate C, I would be walking rounds and doing

17

1      hydrants.  If I was at the main gate, then I would just be

2      sitting at the main gate so...

3   Q.  My question was not very clear.  Prior to the time that you

4      were placed on light duty, tell me what your job duties and

5      responsibilities were.  Didn't you make rounds through the

6      plant?

7   A.  Depending on what gate you were at, yes.

8   Q.  Okay.

9   A.  If I was at gate C, I would make rounds.  If I was gate A,

10     no, I wouldn't make rounds.

11  Q.  Okay.  But, at any rate, after you returned and you were put

12     on light duty, you were relegated, so to speak, to a desk

13     job?

14  A.  Yes.

15  Q.  Okay.  And about how long a period of time was it, Ms.

16     Heston, from the time you came back to work -- you were off

17     because of your injury from the fire job.  You came back to

18     work and you hurt yourself at the Caterpillar plant and you

19     were off work again --

20  A.  I don't think I was off.  I think it might have been like

21     three days or less than a week or something.

22  Q.  All right.  You came back to work after that injury.  And is

23     that when you were told that you were going to be moved to

24     the Caterpillar Logistics plant?

25  A.  Yes.

18

1  Q.   Okay.  And if I asked you this, I'm sorry.  But who told you

2       that, Jankovsky?

3  A.   It could have been Anthony Pedigo, but it could have been

4       Jankovsky.  I'm not for sure, it's so long ago.

5  Q.   All right.  And the job that you were moved to at Cat

6       Logistics was the same kind of job you had at the Joliet

7       plant?

8  A.   No, it wasn't.

9  Q.   All right.  How was it different?

10  A.   There was no fire and it was security at a main gate where,

11       instead of just doing rounds and hydrants, you would do like

12       rounds and checkpoints and make badges and check people in

13       and out the main gate.  So coming and going, leaving the

14       building, was my priority.

15  Q.   All right.  And, in fact, those were the same kinds of

16       things that you had done at Logistics, weren't they?

17  A.   Yeah, but it was more front gate.

18  Q.   And were you paid the same amount of money after the

19       transfer to Logistics that you had been paid at Joliet?

20  A.   Yes.

21  Q.   All your benefits were the same?

22  A.   I don't know about the benefits, but I know the pay stayed

23       the same.  I don't remember what kind of insurance or if I

24       even had it with them.  I think I might not have had

25       insurance with them.

19

```
1  Q.  And so if you were going to sum up what was different about
2      your job after you were transferred to Cat Logistics, how
3      would you do that?
4  A.  Can you say that again?
5  Q.  Yeah.  What was different after you got transferred to
6      Logistics with your job?
7  A.  From Cat?  From the main Cat?
8  Q.  Yeah.  You told me that you no longer did any kind of
9      fire --
10 A.  There was less -- there was less employees, one thing.
11     There was less Cat employees that you dealt with, and there
12     was also less Guardsmark employees.  So you ran -- we all
13     ran out of the same office.  It was the office to enter and
14     exit the building.  You took care of Guardsmark people, West
15     staff people, and Cat Logistics people.  You made badges.
16     And although they would have you go out and, like, mark a
17     hydrant yes or no, it wasn't like you had to go flow them or
18     something like you might have done at Inland or might have
19     done at Cat; whereas, you might just look for an open and
20     close sign and just walk and make sure that it's, the right
21     way, tagged.  So it was a smaller facility also, you know --
22 Q.  Okay.
23 A.  -- just mostly indoor walking.  Not a lot of outdoor like
24     the other jobs were too.
25 Q.  Okay.  All right.  And to make sure that I understood your
```

KAREN M. PRICE & ASSOCIATES
(219) 756-0702

20

1    previous answer to my question, much of what you had done at

2    Logistics you continued to do -- I'm sorry -- at Joliet you

3    continued to do at Logistics.

4    A.   Much of it?

5    Q.   Yeah.

6    A.   As far as security, yes.  But some of the details changed,

7         like I never made badges at either one of the other

8         facilities.

9    Q.   Okay.  What else changed?

10   A.   Not too much.  You report to your Guardsmark supervisor; you

11        report to your employer through them.  Like I said, just a

12        little less, maybe, walking or a little less...

13   Q.   Okay.  It was pretty much the same job, wasn't it?

14   A.   No, I don't feel so.

15   Q.   Okay.  Well, then tell me what was different.

16   A.   I just did.

17        MR. PLANTZ:  She just did.

18   Q.   So far you've told me that you didn't make badges at

19        Joliet.  So what else was different?

20   A.   You didn't go flow the hydrants like you did at Joliet.

21   Q.   Okay.

22   A.   You didn't go on, like, a spill or an alarm going off at

23        Joliet.

24   Q.   Okay.

25   A.   There was just differences.

31

1      other than the two that you mentioned to me today?

2  A.   I don't recall so.

3  Q.   Did you ever tell anybody, Ms. Heston, that Caterpillar had,

4      in fact, given you a glowing appraisal?

5  A.   No, I did not.

6  Q.   Okay.  Did you ever have any conversations with anybody at

7      Guardsmark about Caterpillar's input in the appraisal

8      process?

9  A.   Yes, I did.  Yes.

10  Q.   Who did you have that conversation or those conversations

11      with?

12  A.   Mike Jankovsky.

13  Q.   Tell me about that.  Was it one conversation or more than

14      one?

15  A.   One.  One conversation.

16  Q.   When was that?

17  A.   It had to be about the time I was asking for my raise, and

18      he came into the plant.  And I asked him about my raise; and

19      the conversation went into, We pay you too much money for

20      this account.  I can't give you a raise.  You're making more

21      than everybody else here.  Our guards make $10.  You're

22      making $12.  You're making supervisor rate of pay.  I had

23      been asked if I would take the supervisor pay before.  I

24      said I wouldn't take it, because they'd fired three

25      supervisors since I'd been there.  So I thought, I don't

KAREN M. PRICE & ASSOCIATES
(219) 756-0702

32

```
 1      want to take the supervisor.  I'll lose my job.

 2           So I understood that I made the pay, but I understood

 3      that, you know, it was more responsibility than I wanted.

 4      Plus, they didn't seem to like the supervisors, so I didn't

 5      want it.

 6           And he had just went on to tell me that that's why my

 7      evaluations hadn't really come through, that there was --

 8      this account was losing money because of me.  They had to

 9      pay a supervisor that rate, they had to pay me that rate,

10      and they paid everybody else less than that.

11           And when I asked about my evaluation, he said, Well,

12      you said that you had an evaluation here.

13           I said, No, I didn't.  I said I asked if I had an

14      evaluation done and she told me no.

15           And that was the end of that conversation about -- I

16      said -- I said, I don't believe -- I think I told him Krista

17      didn't have any complaints about me.  And that was the end

18      of that.

19  Q.  You used the word "she."  Were you referring to Kathy

20      Whitten or were you referring to Krista Mayo?

21  A.  Krista Mayo.  I worked midnights so Krista Mayo was my

22      direct supervisor.

23  Q.  All right.  And, in fact, were you making more than any

24      other Guardsmark employee at your grade level?

25  A.  That's what they told me, yes.
```

33

1  Q.   Well, you know you were, don't you?

2  A.   That's what they -- yeah.  Well, I was.  I was making the

3       same as Scott Furlong.

4  Q.   And he was the supervisor?

5  A.   He was my new supervisor, yes.

6  Q.   How many other -- was your title, your job title, at Cat

7       Logistics "security officer"?

8  A.   I believe so.

9  Q.   All right.  How many other security officers were there at

10      the same time, let's just say in October of '02?

11  A.   Maybe five or six.

12  Q.   Okay.  Do you know who they were?

13  A.   No, because they were new.  No, I really don't.

14  Q.   Was there a lady named Jones who was a security officer?

15  A.   I think there was a black lady named Jones, yes.

16  Q.   Do you recall any of the other names?

17  A.   No, I don't.  Maybe a Mike.

18  Q.   Did you ever have any discussions, Ms. Heston, with any of

19      the other security officers about how much money they made

20      or how much money you made?

21  A.   I think maybe -- maybe around our raise times, yeah.  Maybe

22      when we were waiting for our evaluations we would talk.

23      Yeah.

24  Q.   And from those discussions, you know for a fact that you

25      were making more money than the other security officers were

37

1   Q.   Okay.

2   A.   I don't know how to explain that.

3   Q.   Well, I see up at the top of Exhibit 1 it says "amended."

4   A.   Okay.  That's what I'm talking about.  That's what I thought

5        this was, sir.

6   Q.   So I'm assuming that this is the final version of whatever

7        you filed.

8   A.   Okay.

9   Q.   And you'll note that this has a charge number of 60 at the

10       top.  This one has a charge number of 61.

11  A.   Okay.

12  Q.   And I'll just tell you that the EEOC assigns numbers to each

13       charge.

14  A.   Okay.  So this is what I was talking about.  So it's

15       amended.  Okay.

16  Q.   All right.  So Exhibit 2 now, which I'm proffering, is that

17       your signature at the bottom?

18  A.   Yes, it is.

19  Q.   And it's dated May 17th of '02; right?

20  A.   Yes, it is.

21  Q.   Okay.  And that is the second charge you filed; am I

22       correct?

23  A.   '99.  Does this mean I charged this day or this day?

24  Q.   That's when you signed it.

25  A.   This day?  Okay.

38

1   Q.   I guess. Did you write that in?

2   A.   Well, I just see two dates here. That's what I was just

3       wondering. And these are the same date. That's why I was

4       asking.

5   Q.   Well, I don't know. I didn't fill it out.

6          Is the document that I'm now gonna list as Exhibit 2,

7       is that the second charge that you filed against Guardsmark?

8   A.   Yes.

9   Q.   Okay. Now what happened -- if I understand things, you tell

10      me if I'm incorrect. Charge No. 1 was resolved.

11   A.   With the union and with the EEOC, they paid me my wage, as

12      it shows you, that they gave the men; and then they offered

13      me a transfer out of there. Yes.

14   Q.   Okay. So Charge 1 was resolved?

15   A.   Yes.

16   Q.   All right. Charge 2, what happened to it?

17   A.   Nothing. They kept -- they kept just doing the same thing.

18   Q.   Well. Was Charge 2 resolved?

19   A.   I don't believe so.

20   Q.   Did it go to court? What happened to it?

21   A.   They just transferred me again.

22   Q.   "They" being Guardsmark?

23   A.   Yes.

24   Q.   Okay. And then the third charge that you filed is the

25      charge that's attached to the complaint in this lawsuit; is

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA ☐ EEOC | 24BA 2006I |

_____ and EEOC

*State or local Agency, if any*

**NAME** *(Indicate Mr., Ms., Mrs.)*
Ms. Sandra Denise Trevino Heston

**HOME TELEPHONE** *(Include Area Code)*
(219) 985-2602

**STREET ADDRESS**
2802 W. 39th Place

**CITY, STATE AND ZIP CODE**
Gary, IN 46408

**DATE OF BIRTH**

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** *(If more than one list below.)*

**NAME**
Guardsmark

**NUMBER OF EMPLOYEES, MEMBERS**

**TELEPHONE** *(Include Area Code)*
(309)674-0430

**STREET ADDRESS**
207 Main St., Suite 425

**CITY, STATE AND ZIP CODE**
Peoria, IL 61602

**COUNTY**

**NAME**

**TELEPHONE NUMBER** *(Include Area Code)*

**STREET ADDRESS**

**CITY, STATE AND ZIP CODE**

**COUNTY**

**CAUSE OF DISCRIMINATION BASED ON** *(Check appropriate box(es))*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST                    LATEST

August 20, 2001

☐ CONTINUING ACTION

**THE PARTICULARS ARE** *(If additional space is needed, attach extra sheet(s)):*

I. I have been employed by Guardsmark since January 4, 1999. My position is Security, but currently I am on light duty at Caterpillar Logistics.

II. After transferring to Caterpillar, Rt. 6 in Joliet in 2000 from Inland Steel Company in East Chicago, Indiana, I went on Medical Leave due to an injury on the job. After my medical release from Worker's Compensation in August, 2001, I was informed by Michael Janovsky, Manager that my position would be filled and I would no longer have a job unless I would take a transfer. I filed a previous discrimination complaint against Guardsmark.

III. I believe I have been Retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

**DEPOSITION EXHIBIT**
Z
1-24-07 Op
PENGAD 800-631-6989

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | **NOTARY** - *(When necessary for State and Local Requirements)* |
|---|---|
| | Maria D Benetta 7-17-2002 |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | **SIGNATURE OF COMPLAINANT** |
| | *Sandra Trevino Heston* |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |
| Date 5-17-02   *Sandra Trevino Heston* | (Month, day and year) |
| Charging Party *(Signature)* | 5 17 2002 |

EEOC Form 5 (Rev. 07/99)

40

| | | |
|---|---|---|
| 1 | A. | I know they just transferred me to never give me an answer. |
| 2 | | Yes. |
| 3 | Q. | What did the EEOC do with charge No. 2, Exhibit 2? |
| 4 | A. | They were investigating it to see if there was any validity |
| 5 | | to the way I was being treated. |
| 6 | Q. | All right. And what was their conclusion? |
| 7 | A. | By the end of September of '02, they were concluding that |
| 8 | | the case would be closed. |
| 9 | Q. | Okay. And how do you know that? |
| 10 | A. | Because Anthony Pedigo told me. |
| 11 | Q. | All right. So the charge that resulted in what we have |
| 12 | | listed as Exhibit 2, to your understanding, was closed? |
| 13 | A. | That it would be closed in September. |
| 14 | Q. | Okay. |
| 15 | A. | This was in May at this time, yes. |
| 16 | Q. | Yeah. There's always a lag. You file a charge and then |
| 17 | | something happens; and at some point in time, there's some |
| 18 | | disposition of it. Is that a word, "disposition"? Close |
| 19 | | enough. |
| 20 | A. | Disposed, disposed of. |
| 21 | Q. | All right. Okay. So you were terminated from Guardsmark in |
| 22 | | October of '02. Does that sound right? |
| 23 | A. | Yes. |
| 24 | Q. | All right. Meaning that you would have worked for |
| 25 | | Guardsmark for about how long a period of time? |

47

1       in October, I was.

2   Q.  And who told -- is -- what you've related to me, is this --

3       are these things that Anthony Pedigo told you?

4   A.  Anthony Pedigo told me about my charges with the EEOC being

5       discharged in September, which I did check with the EEOC and

6       they confirmed it.  But he shouldn't have known that, and he

7       knew it because of Mike Jankovsky.

8   Q.  Why should -- excuse me.  Why should -- what was Mr.

9       Pedigo's position?  He was the supervisor, wasn't he?

10  A.  Not Pedigo.  This was at -- I'm sorry.  Scott Furlong.  That

11      was the one.  I'm sorry.  Was I saying Pedigo?

12  Q.  Uh-huh.

13  A.  Scott Furlong was my Cat Logistics boss.

14  Q.  So Scott Furlong --

15  A.  He was the one who told me that my case would be closed in

16      September.

17  Q.  The case with the EEOC?

18  A.  Yes, which he knew from Mike Jankovsky.

19  Q.  Did he tell you he knew that from Mike Jankovsky?

20  A.  Yes, he did.

21  Q.  And did he tell you how Mike Jankovsky knew it?

22  A.  No, he did not.

23  Q.  Okay.

24  A.  But he also made a statement to Krista Mayo.  And it wasn't

25      him who told me that.  Krista Mayo told me that Scott

49

1      said?

2  A.   I have no idea.  I never got a raise.  They told me I made

3       too much money.  I wasn't getting a raise.

4  Q.   Did Ms. Mayo ever tell you that Ms. Whitten had problems

5       with your job performance?

6  A.   No, she did not.

7  Q.   Okay.

8  A.   I know that Guardsmark had a problem with my pay at that

9       job.  So if -- I'm sure -- and that's just my speculation is

10      that if they could get Logistics to say you're not doing

11      your job, you know, could you write something that she's not

12      doing her job, because we're losing money on this account by

13      paying her to stay here.

14 Q.   Well, are you telling me that occurred?

15 A.   That's how I feel it occurred.

16 Q.   Well, here's my question:  Are you telling me that it, in

17      fact, occurred or are you simply speculating?  Nobody ever

18      told you that, did they?

19 A.   Told me what?

20 Q.   Whatever it was you just testified about Guardsmark going to

21      Cat and telling them something about --

22 A.   No.  What they told me was that I made too much money and

23      that this account was losing because of me.  That's what I

24      was told specifically.

25 Q.   And who told you that?  Jankovsky?

50

1  A.  Mike Jankovsky.

2  Q.  Okay.  Now with regard to this charge that is reflected by

3      Defendant's Exhibit 2, the second charge that we've talked

4      about --

5  A.  Yes.

6  Q.  -- you have told me that Scott Furlong told you that -- and

7      I'm paraphrasing here -- that it would be dropped.

8  A.  Yes.

9  Q.  Okay.  Is that what he said to you?

10 A.  His exact words were that your case with the EEOC would be

11     dropped.  Yep.

12 Q.  And when was that?  When was that conversation?

13 A.  In September.  His exact words were that it would be

14     dropped.

15 Q.  September of '02?

16 A.  Yep.  It will be dropped that month.

17 Q.  And, in fact, had the case already been dropped when he told

18     you that?

19 A.  No.  It was -- nope.

20 Q.  How do you know that?

21 A.  Because when I called the EEOC, it hadn't been dropped.  And

22     then shortly after that, the case was dropped.

23 Q.  All right.  But you don't remember when you had this

24     conversation with Furlong?

25 A.  In September.

59

1     Different times?

2  A.  Different times.

3  Q.  Different times?

4  A.  Yes.

5  Q.  Why would you have had a discussion with Furlong once or

6     twice and then had a separate discussion with Mike

7     Jankovsky?

8  A.  Because Scott Furlong was my immediate supervisor, who I saw

9     almost daily, who was the one who was supposed to evaluate

10    me.  Jankovsky was Scott Furlong's and my boss.  And by the

11    second conversation with Scott, I knew that they weren't

12    giving me a raise, because I made too much.  And then that's

13    when Jankovsky told me the same thing.

14  Q.  That you made too much money?

15  A.  That I make too much money on that account and I costed

16    [sic] them money.  His exact words were, They were losing

17    money on that account because of me.

18  Q.  Well, were they?

19  A.  I don't know how the account was set up.  I guess my

20    question to him should have been, Then why did you transfer

21    me here?

22  Q.  Well, you never asked him that, did you?

23  A.  No, I didn't, but I should have.

24  Q.  And, in fact, was Guardsmark losing money on that account

25    because of --

62

1     work overtime or you may come back in the same day, and it's

2     within the same day.

3  Q. As a matter of fact, doesn't the policy provide that that

4     DAR has to be completed and available to your relief --

5  A. Yes.

6  Q. -- before you leave?

7  A. Yes.

8  Q. Before you leave your shift?

9  A. Yes, probably.

10 Q. On September the 17th of 2002 -- that would have been

11    shortly before you left Guardsmark.  September 17th of '02,

12    did you receive a written counseling document from your

13    supervisor?

14 A. I believe I got a written document on the incident with the

15    lady and the parking.  Yes.

16 Q. In March of 2002, were you counseled by David -- is it

17    Patel, P-a-t-e-l, Guardsmark unit manager?

18 A. I have no idea who that is.

19 Q. Okay.  Let me just ask you this.  Once again, I'll need a

20    copy of this.  I'm gonna hand you and your attorney a

21    document.  It seems to be dated March 13th of '02 on it, and

22    it says Sandra Heston on the bottom of it.  Is that your

23    signature?

24 A. Yes.

25 Q. What is that document?

63

| | |
|---|---|
| 1 | A. | That's that lieutenant that I couldn't remember. This is |
| 2 | | the -- this Bohlin, this is the lieutenant that's between |
| 3 | | the Sharon and the -- in between Furlong. |
| 4 | Q. | What was that all about? |
| 5 | | (The deponent reviews a document.) |
| 6 | A. | I think this has to do with either going to pick up the |
| 7 | | checks; or it has to do with them sending you to a class |
| 8 | | that, you know, you'd have to leave the facility and go to |
| 9 | | and from. We wouldn't get paid unless one of us would |
| 10 | | volunteer to go pick up our own checks. Sometimes that |
| 11 | | would mean driving to Aurora. And sometimes they would |
| 12 | | reimburse you like miles or gas. And this has to be |
| 13 | | about -- I must have questioned money in some way or |
| 14 | | something about being paid for going to something or -- I'm |
| 15 | | not sure exactly what that is at all. |
| 16 | Q. | You don't know exactly what it is? |
| 17 | A. | No. |
| 18 | Q. | All right. Do you remember getting it? |
| 19 | A. | No. |
| 20 | Q. | Do you remember signing it? |
| 21 | A. | That is my signature, yes, but I don't remember exactly what |
| 22 | | it's for. And it's not very clear, and I can't actually |
| 23 | | read it all. |
| 24 | Q. | Okay. |
| 25 | A. | But I can tell you any time it referred to money with me |

82

1   A.   I believe it was Jankovsky.

2   Q.   Was Mr. Furlong still working at Guardsmark?

3   A.   I think -- I think in that day, I think Kathy Whitten and

4        Furlong and I think Jankovsky all came in at the same time.

5   Q.   Ms. Whitten was involved in your termination?

6   A.   I think she was there.

7   Q.   Okay.  Did she say anything to you?

8   A.   Nobody said anything to me but, Read this.  Sign this.

9        Pretty much, we're done.

10  Q.   Okay.  All right.  On the next page of Exhibit 5, let me

11       point out this paragraph to you.  It's the third paragraph.

12  A.   No. 2?

13  Q.   Yes.  It's the third paragraph actually of the response to

14       interrogatory No. 2.

15            (The deponent reviews the document.)

16  A.   Okay.

17  Q.   You read it?

18  A.   Uh-huh.

19  Q.   Have you talked since you were discharged to either Mr.

20       Furlong, Mr. Baumann, or Mr. Jankovsky?  And that's

21       J-a-n-k-o-v-s-k-y, I believe.

22  A.   I think immediately --

23  Q.   Although, it may --

24            MR. PLANTZ:  Is that spelled right?

25            MR. DOUGHERTY:  I don't think it is.

E-FILED
Tuesday, 01 May, 2007  01:33:56 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SANDRA TREVINO HESTON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06-1172 |
| | ) | |
| v. | ) | |
| | ) | |
| GUARDSMARK, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF JEREMY M. BAUMANN

Jeremy M. Baumann, being above the age of 18, does hereby state under oath of his own personal knowledge:

1. My name is Jeremy M. Baumann.

2. In calendar year 2002, my title at Guardsmark was Unit Manager, and my general duties consisted of management of contract security forces in the State of Illinois.

3. On October 13, 2002, I met with Kathy Whitten, who was the client representative at the Caterpillar Logistics facility in Joliet, Illinois. Ms. Whitten expressed her concern with regard to Sandra Heston's attendance and the demeanor which she exhibited while working at the Caterpillar Logistics facility.

4. As a result of that meeting, I prepared an e-mail, a true and correct copy of which is attached to this affidavit as Attachment 1. That e-mail was to Michael Jankovsky, Manager in Charge of the Peoria branch and was intended to advise him of our client's concerns regarding Ms. Heston.

5. Attached to this Affidavit as Attachment 2 is a true and correct copy of a termination notice which I signed and which was given to Ms. Heston on October 17, 2002.

6. Ms. Heston was terminated for the reasons set out therein.

FURTHER, THE AFFIANT SAYETH NOT.

JEREMY M. BAUMANN

## VERIFICATION

I, Jeremy M. Baumann, do hereby state that the foregoing is true and correct to the best of my knowledge and belief.

JEREMY M. BAUMANN

State of Illinois

County of DuPage

SWORN TO AND SUBSCRIBED before me this 30th day of April, 2007.

Kenneth J. Grosskopf
Notary Public

My Commission Expires:

10/28/09

OFFICIAL SEAL
KENNETH J GROSSKOPF
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/28/09

- 2 -

ATTACHMENT 1



Jeremy M. Baumann                    To: Michael W. Jankovsky
10/17/02 03:52 PM

                                      Subject:
                                      Retain Until: 01/17/2004        Retention Category: 090 - Information and
Guardsmark Confidential Green                                        Reports

Sir,

Per our conversation yesterday, based on client concerns as to attendance and demeanor, (raised in my meeting with Kathy Whitten at Joliet CLS on Monday, October 13, 2002), Sandra Heston was terminated this morning.  She was timed out at 0730 hours on today's date, and has turned in her badge and keys.


Jeremy M Baumann
Unit Manager
Guardsmark, Inc.

200313

ATTACHMENT  2

**GUARDSMARK**

October 17, 2001

Guardsmark, Inc.
207 Main Street Suite 505
Peoria IL 61602-1325 USA
Telephone 309 674 0430
Telefax    309 674 0438

Ms. Sandra D. Heston
2802 W. 39th Place
Gary, IN 46408

This letter is to advise you of your termination. This action is based on the following reasons:

In July 2001, you were removed from Caterpillar Joliet Rt. 6 because of client concerns regarding your attendance and performance. Nonetheless, Guardsmark provided you with another opportunity to succeed in you employment by placing you at another facility at your same wage rate.

Your attendance over the last 12 months included 16 call offs and 34 late arrivals. *(This contrasts the 1 call off and 7 late for the other two officers combined for the same time period.)* This is a violation of GOR&I General Orders, Paragraph 14 &16.

In March 2002, you received a written disciplinary action based on your poor client interaction, violation of chain of command and refusal to follow orders. This is a violation of GOR&I General Orders, Paragraph 5.

On August 27, 2002, you received sub-standard marks on your yearly review in attendance and communications. However, Guardsmark staff continued to work with you to improve your problem areas and still receive your raise by placing you into an evaluation period with specific measurable goals which, if attained, would still yield the appropriate pay raise, even though you are well above standard pay at that facility. This is a violation of GOR&I General Orders Paragraph 14 & 16.

On August 27, 2002, you lied directly to Mike Jankovsky, Manager in Charge, Peoria, and Jeremy Baumann, Unit Manager, saying that the client had given you a "glowing" review. Subsequent investigation revealed the client never reviewed you at all. This is a violation of the Code of Ethics.

Your attendance was so poor that it was cited by Lt. Furlong as a major contributing factor to his resignation, which was submitted on 10-10-02. You were to receive a last chance letter concerning attendance on 10-14-02. However, before such a letter was issued, Guardsmark was made aware of the following misconduct and rule violations:

1) Allowing a CLS employee on facility with odor of alcohol on breath.
2) Loaning your personal vehicle to a CLS employee.
3) Taking a report home to finish it. This is a violation of GOR&I Regulations Paragraph 9.
4) Multiple substantiated complaints on attitude & demeanor. This is a violation of GOR&I Regulations Paragraph 3a.

As a result of these actions and your poor attendance, the client at Caterpillar Joliet CLS has requested that you no longer be assigned to the CLS facility.

Guardsmark has given you numerous opportunities to succeed in your employment. You have consistently violated Guardsmark policies and procedures. Therefore, Guardsmark is terminating your employment effective immediately. Please make arrangements to return all Guardsmark property by October 25, 2002. Your last check will be delivered to you via U.S. Mail to the above address.

Jeremy M. Baumann
Unit Manager, Guardsmark, Inc.

Michael W. Jankovsky
Manager in Charge, Guardsmark, Inc.

EXHIBIT  F

200062

E-FILED
Tuesday, 01 May, 2007  01:34:13 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **SANDRA TREVINO HESTON,** | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 06-1172** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GUARDSMARK, INC.** | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF WILLIAM P. DOUGHERTY**

William P. Dougherty, being above the age of 18, does hereby state under oath of his own personal knowledge:

1.    My name is William P. Dougherty.

2.    I am counsel for Guardsmark, Inc. in this lawsuit.

3.    Attached to this Affidavit is a true and correct copy of a Certificate Form from the United States Bankruptcy Court for the Northern District of Illinois certifying that the bankruptcy case file sent by the Clerk is a complete and correct copy of the original as it appears of record and on file in the Office of the Clerk of the Bankruptcy Court. Included in the file and attached here is a true and correct copy of the docket sheet reflecting the filing by plaintiff of a Chapter 7 Voluntary Petition on November 25, 2003, and the entry of an Order dated March 25, 2004 closing the case. Also attached is a true and correct copy from that file of the page entitled Schedule B-Personel Property which reflects at Box No. 20 that no

1

disclosure of Ms. Heston's pending EEOC charge was made in the bankruptcy proceeding.

FURTHER, THE AFFIANT SAYETH NOT.

_____
WILLIAM P. DOUGHERTY

## VERIFICATION

I, William P. Dougherty, do hereby state that the foregoing is true and correct to the best of my knowledge and belief.

_____
WILLIAM P. DOUGHERTY

State of Tennessee

County of Shelby

SWORN TO AND SUBSCRIBED before me this _30_ day of April, 2007.

_____
Barbara L. Pool
Notary Public

My Commission Expires:

_August 31, 2010_

- 2 -

# United States Bankruptcy Court

For the Northern District of Indiana

I, <u>CHRISTOPHER M. DE TORO</u>, Clerk of the Bankruptcy Court

in and for said District, do hereby certify that the attached copy of the Docket, Chapter 7

Voluntary Petition, Statement of Financial Affairs, Schedules A-J, Attorney Fee Disclosure

Statement, Statement of Intentions, Verification of Creditor Matrix, Order to Amend dated

November 25, 2003, BNC Certificate of Service of Order to Amend, Amended Schedules and

Notice of Amendment, Order Scheduling Hearing on Dismissal of Case dated

December 29, 2003, BNC Certificate of Service of Order Scheduling Hearing on Dismissal of

Case, Notice of Amendment and Amended Schedules, Notice of Docket Entry dated

February 2, 2004, Reaffirmation Agreement filed February 3, 2004, BNC Certificate of

Service of Notice of Docket Entry dated February 2, 2004, Discharge of Debtor, BNC

Certificate of Service of Discharge of Debtor, Order Approving Final Account, BNC

Certificate of Service of Order Approving Final Account, in the case of Rodney Jay Heston

and Sandra Denise Heston,  Debtors, No. 03-65712,  has been compared with the original

thereof and that it is a complete and correct copy of such original as it appears of record and on file in my office.

    In testimony whereof I have hereunto set my hand at 5400 Federal Plaza, Suite 2200, Hammond, Indiana,  in said District, this 29th day of March, 2007.

                                   **CHRISTOPHER M. DE TORO**
                                   *Clerk of the Bankruptcy Court*

                                   *Deputy Clerk*

[*Seal of the US Bankruptcy Court*]

Date of Issuance:   March 29, 2007

**CLOSED**

# U.S. Bankruptcy Court
## Northern District of Indiana (Hammond Division)
### Bankruptcy Petition #: 03-65712-jpk
#### Internal Use Only

*Assigned to:* J. Philip Klingeberger
Chapter 7
Voluntary
No asset

*Date Filed:* 11/25/2003
*Date Terminated:* 03/25/2004
*Date Discharged:* 02/23/2004

**Debtor**
**Rodney Jay Heston**
2802 West 39th Place
Gary, IN 46408
SSN: 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

represented by **Paul Psomadelis**
3530 Fairview Avenue
Suite F & G
Lake Station, IN 46405
(219) 962-8038

**Debtor**
**Sandra Denise Heston**
2802 West 39th Place
Gary, IN 46408
SSN: 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
*aka*
**Sandra Denise Trevino**

represented by **Paul Psomadelis**
(See above for address)

**Trustee**
**Calvin D. Hawkins**
4858 Broadway
P.O. Box 64859
Gary, IN 46401
(219) 887-2626

**U.S. Trustee**
**Nancy J. Gargula**
One Michiana Square
5th Floor
100 East Wayne Street
South Bend, IN 46601
574-236-8105

| Filing Date | # | Docket Text |
|---|---|---|
| 06/09/2004 | 17 | Return Mail (lburt, ) Modified on 3/29/2007 entered in wrong case (pjn, ). (Entered: 06/09/2004) |
| 03/27/2004 | 16 | BNC Certificate of Mailing. Service Date 03/27/2004. (Related Doc # |

U.S. Bankruptcy Court, Northern IN - CM/ECF System - Docket Report          Page 2 of 4

|  |  | 15) (Admin.) (Entered: 03/28/2004) |
|---|---|---|
| 03/25/2004 | ◑15 | Order Closing Case Entered on 3/25/2004 (pjn, ) (Entered: 03/25/2004) |
| 02/26/2004 | ◑14 | BNC Certificate of Mailing - Order of Discharge. Service Date 02/26/2004. (Related Doc # 13) (Admin.) (Entered: 02/27/2004) |
| 02/23/2004 | ◑13 | Order Discharging Debtor (Admin.) (Entered: 02/23/2004) |
| 02/17/2004 | ◑ | Trustee's Report of No Distribution: Trustee of this estate reports that the trustee has neither received any property nor paid any money on account of this estate except exempt property; that the trustee has made a diligent inquiry into the financial affairs of the debtor(s) and the location of the property belonging to the estate; and that there is no property available for distribution from the estate over and above that exempted by law. Pursuant to FRBP 5009, I hereby certify that this estate has been fully administered. I request that this report be approved, and that I be discharged from further duties as trustee. Filed by Trustee Calvin D. Hawkins without Certificate of Service (Hawkins, Calvin) (Entered: 02/17/2004) |
| 02/04/2004 | ◑12 | BNC Certificate of Mailing. Service Date 02/04/2004. (Related Doc # 10) (Admin.) (Entered: 02/05/2004) |
| 02/03/2004 | ◑11 | Reaffirmation Agreement Between Debtor and Beneficial Mortgage Company with Affidavit (Declaration) Filed by Debtors Rodney Jay Heston , Sandra Denise Heston (pjn, ) (Entered: 02/03/2004) |
| 02/03/2004 |  | Documents terminated. (pjn, ) (Entered: 02/03/2004) |
| 02/02/2004 | ◑10 | Docket Entry: Hearing held on 1/30/04 RE:(related document(s)7 Motion to Dismiss. APPEARANCES: Atty. Psomadelis on behalf of Debtors. The Court withdraws its motion to dismiss case based on the filing of conforming amended schedules. (pg,) (Entered: 02/02/2004) |
| 01/07/2004 | ◑9 | Amended Schedules: A-J, with Notice of Amendment and Signature pages. Receipt Number n/a, Fee Amount $26 Filed by Debtors Rodney Jay Heston , Sandra Denise Heston (related document(s)1 Voluntary Petition (Chapter 7), Voluntary Petition (Chapter 7) filed by Rodney Jay Heston, Sandra Denise Heston) (pjn, ) (Entered: 01/07/2004) |
| 01/01/2004 | ◑8 | BNC Certificate of Mailing. Service Date 01/01/2004. (Related Doc # 7) (Admin.) (Entered: 01/02/2004) |
| 12/29/2003 | ◑7 | Order to Set Hearing regarding dismissal of debtors' case for failure |

| | | |
|---|---|---|
| | | to comply with RE: Order to Amend, Entered on 12/29/2003(related document(s)2 Order to Amend, ) Hearing scheduled for 1/30/2004 at 10:00 AM at Hammond - 3rd Floor, Courtroom 6. (pjn, ) (Entered: 12/30/2003) |
| 12/23/2003 | ⊙6 | Trustee's Initial Report & First Meeting Held (Hawkins, Calvin) (Entered: 12/23/2003) |
| 12/15/2003 | ⊙5 | Amended Schedules Page, and notice of amendment (no Schedules attached). Receipt Number n/a, Fee Amount $26 Filed by Debtors Rodney Jay Heston , Sandra Denise Heston (pjn, ) (Entered: 12/16/2003) |
| 11/27/2003 | ⊙3 | BNC Certificate of Mailing. Service Date 11/27/2003. (Related Doc # 2) (Admin.) (Entered: 11/28/2003) |
| 11/26/2003 | 4 | Receipt of Chapter 7 Filing Fee - $209.00 by MP. Receipt Number 00022911. (Entered: 11/28/2003) |
| 11/25/2003 | ⊙2 | Order directing debtors To Amend Schedules A-J to include signature page Entered on 11/25/2003(related document(s)1 Voluntary Petition (Chapter 7), Voluntary Petition (Chapter 7) filed by Rodney Jay Heston, Sandra Denise Heston) Amendment due by 12/5/2003. (pjn, ) (Entered: 11/25/2003) |
| 11/25/2003 | ⊙ | Notice of Corrective Entry(related document(s)1 Voluntary Petition (Chapter 7), Voluntary Petition (Chapter 7) filed by Rodney Jay Heston, Sandra Denise Heston) (pjn, ) CORRECTIVE ENTRY: Changed docket text from Schedules A-J to Schedules A-J without signature page; Debtor will need to file signature page on Schedules A-J (Entered: 11/25/2003) |
| 11/25/2003 | ⊙ | First Meeting of Creditors with 341(a) meeting to be held on 12/22/2003 at 12:30 PM at Hammond - 1st Floor, Suite 1700. Objections for Discharge due by 02/20/2004. (lburt, ) (Entered: 11/25/2003) |
| 11/25/2003 | ⊙ | Prior Bankruptcy Case: Case Number: 97-60007, Chapter: 7, Date Filed: 1/3/97, Disposition: Discharged 4-16-97, Date Closed: 11/3/98 (lburt, ) Modified on 11/25/2003 (pjn, ). (Entered: 11/25/2003) |
| 11/25/2003 | ⊙1 | Chapter 7 Voluntary Petition. Statement Of Financial Affairs, Schedules A-J without signature page, Attorney Fee Disclosure, Statement Of Intention, Verification Of Creditor Matrix. Receipt Number OC, Fee Amount $209 Filed by Rodney Jay Heston , Sandra Denise Heston . (lburt, ) Modified on 11/25/2003 (pjn, ). CORRECTIVE ENTRY: Changed docket text from Schedules A-J to |

| | | |
|---|---|---|
| | | Schedules A-J without signature page; Debtor will need to file signature page on Schedules A-J (Entered: 11/25/2003) |

FORM B6B
(10/89)

In re  **RODNEY JAY HESTON**          **SANDRA DENISE HESTON**          Case No. _____
               Debtor                                                                              (If known)

# SCHEDULE B - PERSONAL PROPERTY

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 1. Cash on hand | | **CASH ON HAND** | J | **100.00** |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | **CHECKING ACCOUNT CENTIER BANK GRIFFITH, INDIANA** | J | **100.00** |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | | **TV, VCR, Dinette Set, Bedroom Furniture, Law mower, washer/dryer, micro wave, oven, kitchen utensils** | J | **1,500.00** |
| 5. Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | | **EVERYDAY WEARING APPAREL** | J | **300.00** |
| 7. Furs and jewelry. | X | | | |
| 8. Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | X | | | |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 14. Government and corporate bonds and other negotiable and nonnegotiable instruments. | X | | | |

FORM B6B
(10/89)

In re  **RODNEY JAY HESTON**         **SANDRA DENISE HESTON**         Case No. _____
         Debtor                                                                              (If known)

# SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 15. Accounts receivable. | X | | | |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 22. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23. Automobiles, trucks, trailers, and other vehicles and accessories. | | 2002 ESCORT | J | 15,000.00 |
| | | F150 FORD PICKUP | J | 25,000.00 |
| 24. Boats, motors, and accessories. | X | | | |
| 25. Aircraft and accessories. | X | | | |
| 26. Office equipment, furnishings, and supplies | X | | | |
| 27. Machinery, fixtures, equipment and supplies used in business. | X | | | |
| 28. Inventory | X | | | |
| 29. Animals. | X | | | |

FORM B6B
(10/89)

In re  **RODNEY JAY HESTON**        **SANDRA DENISE HESTON**        Case No. _____

Debtor                                                              (If known)

# SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| TYPE OF PROPERTY | NONE | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 30. Crops - growing or harvested. Give particulars. | X | | | |
| 31. Farming equipment and implements. | X | | | |
| 32. Farm supplies, chemicals, and feed. | X | | | |
| 33. Other personal property of any kind not already listed. Itemize. | X | | | |
| | | <u>2</u>   continuation sheets attached | Total ▸ | $ 42,000.00 |

(Include amounts from any continuation sheets attached. Report total also on Summary of Schedules.)